①

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 0 3 2008

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
Pine Bluff Division

Yitzhak Abba Marta                    Petitioner

VS.                         Civil Case No 5:08 CV00171 HLJ

Larry Norris Director
Arkansas Department of Correction        Respondent

Motion

In support of Petitioner newly discovered evidence to his
Federal Habeas Claims. As so ordered on August 5th 2008
by U.S. Magistrate Judge Henry L. Jones Jr.

* Before My trial State Deputy Prosecutor Bruce A. Rhoades
had one of my key witnesses for my defense shipped out of
state in order to keep Kevin wages from testifying on my
behalf (Please see Attach Statement enclosed) had I not
been deprived of my constitutional right to this witness
he would have been able to provide crucial testimony to the
fact that I was not present when they crime was committ-
ed. infact he would have testify'd that he herd Adam
Blackford Co defendent in this case, addmitt that
he alone killed the Victom Alan F. walker and -
that he Adam had to keep his deal with the state.
and take me down. this Prsecutorial mis conduct was
kept from me that is untill my private investigator Don
Dunn who is working my case for free found my wittness
Kevin wages in a correctional Institution in Boise Idaho
thes newly discoverd evidence was not discovered untill
Late 2007 when I was Notified by Don Dunn and was not

②

Confirmed untill 10-5-07. Petitioner's Attorney at
the time new full well what the deputy Prosecutor
had done to my wittness but turned the blind eye
and Kept me in the dark all thes years. this —
Attorney promised me that he would call this wittness
to the stand but to no Avail instead he allowed
Prosecutor mr Rhodes full range to flush my right's
down the toilet. by my own Attorney Denny Hyslip 10#22008

★ I would at this time ask this court to pleas take
into consideration this next issue. the fact that 1 —
was left hand cuffed and shakked with a belly chais
around my waist all 3 day's of my trail. in front
of the jury by the trail judge who never gave
or had any reason for the record for such action
I asked my Attorney to appeal this issuebut to no
Avail he gave me his word but did not keep it.
it is my feeling that I was devied a fair trial from
the start because of the above issue and ther for
I pray that this court has mercy and sees this
in justice and grants me a new and fair trail,

I have also ~~addressed~~ enclosed an old copy of my
Arkansas State Habeas Pition which was deied but
I would pray this court reviews.

         Thank you & God bless

         Yitzhak A morta 102554
         Cummins unit 9B
         PO Box 500
         Grady AR 31644

STATE OF ARKANSAS

COUNTY OF LINCOLN

102554 ADC.
Yitzhak A. Marta
Cummins Unit 9B
P.O. Box 500
Grady, AR 71644

I further swear that the statements, matters and things contained herein are true and accurate to the best of my knowledge, information and belief.

8-24-08
DATE

AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, on this 24th day of August, 2008.

NOTARY PUBLIC

My Commission Expires: 5-24-16

# DON H. DUNN, (RET.)
# DUNN'S INVESTIGATIONS
212 Valley View Church Rd

Harrison, AR 72601

07/18/2008

Honorable Henry L. Jones, Jr.
U.S. Magistrate
U. S. District Court
600 W. Capitol, Avenue, Suite A 149
Little Rock, AR 72201-3325

Re: CV0071HLJ
Yitzhak Abba Marta
ADC# 102554

Dear Judge:

Mr. Marta requested me to write you and inform you of the details of his conviction. I would rather be able to be present and to testify at any hearing you may decide to have.

I entered this case immediately after its inception and have followed it intensely with intensive investigation. I uncovered facts that would clear Mr. Marta of any criminal implication in this case, but was stifled by the then deputy Prosecutor of Washington County. There were witnesses who could clear Mr. Marta of the allegations, but they were suppressed and one was whisked away out of state at the request of the deputy Prosecutor. I went to Boise, Idaho at my own expense to interview a witness and I have a notarized statement from him that would have no doubt cleared Mr. Marta had he been allowed to testify. The deputy Prosecutor knew what his testimony would be and prevented his testimony. I was not aware of this until l read a transcript of the file and learned the witness did not testify. It was only after I contacted the Idaho witness that I learned the truth of what had happened regarding his lack of testifying.

I will be happy to give you a written account of my investigation, but I would prefer to testify before you and answer any question you may have. I will tell you that I am so convinced of Mr. Marta's innocence that I have been doing this pro bono for

several years.  I can assure you that Mr. Marta is an innocent man and he will die in prison for a crime he did not commit unless someone has enough compassion to listen.  I look forward to hearing from your office.

Mr. Marta's name is pronounced as Isaac in the English spelling, but he spells it as Issac.

Sincerely,

Don H. Dunn, ret.

Copy: Honorable Richard Arnold

Issac Marta



# Statement of Kevin Wages

Recorded by Don H. Dunn at Idaho

Correctional Institution, Boise, Idaho

October 5, 2007

This is Don Dunn and I am recording a statement from Kevin Wages.  Today is Friday, October 5th , 2007.  We are located at the ...tell me where we are Kevin.

K. At the Department of Corrections, Boise Idaho,.

D. Ok.  Is this town called Kuna?

K. Kuna (Kyoona)

D. Kuna?

K. Yes.

D.  All right, and present in the room with me is Mr. Jeff Kirkman.  He is the Manager Assistant to the Warden at this facility.  The time is about 1:12 p.m.  Okay, Kevin, you have met me before and would you tell me when that was?

K. Back in 1997.

D. And where was it?

K. Harrison County jail.

D. You mean Washington County?

K. I mean, Washington County, Arkansas.

D. And why were you there?

K. I was on a hold for transport back to Idaho.

D. Okay, and how long had you been in jail down there when I saw you.  Do you recall?

K. I had been there just a couple of days.

D. Okay.  Now you are aware that we are recording this conversation and it is with your permission?

K. Yes, sir.

D. Ok,  And you know why I came to see you?

K. Yes, sir.

D.  We had contacted, or you had contacted me by phone here awhile back and I also got a letter from you with a statement it?

2

D. All right,  Now, when you were in the jail how long did you stay there?

K. I was supposed to be there 30 days.  I don't recall how long I stayed there, really,  I know it was not 30 days.

D. Do you recall about how long you stayed there after you had talked to me?

K. I was gone probably the next day or so.

D. Did you talk to anyone in the jail administration after you had talked to me?

K. No, I don't think so.

D. Did you remember a prosecutor there?  Did he ever talk to you?

K. Umm, I guess…I don't remember his name.

D. Would Bruce Rhoades sound right?

K. Yes, that's him. R-H-O-A-D-E-S.  That's him.

D. He…did he talk to you after I talked to you?

K. Yeah.  It was right after you talked to me.

D. And what did he want to talk to you about?

K. About a murder case that was goin' on.

D. And do you remember what he asked you about it?

K. Ah, he asked me what I knew and I told him what I knew and what I observed and what I heard from both inmates at the time, and he asked me about if I believed them and I told him, "yes, I believed them," and then I am pretty sure that was all.  He was not in there too long.  He just wanted to know what my side of the story was.  Just what I had heard.

D. Did you tell him essentially what you had told me prior to that?

K. Yes, I did.

D. So, if I understand you correctly, Bruce Rhoades knew your story about Issac Marta?

K. Yeah.

D. And then within the next day you were gone?

K. Yeah, a transport company came and (unintelligible)

D. That's what I thought.  Ok,  now, were you in the cell with Issac Marta?

K. Yes.

D. And do you know how long you were in the cell with him?

K. Ah, we weren't actually living together in the cell.  There was other cells. I was across the way there.

D. Ok.

3

D. Ok.

K. I believe it was the 2nd day I started talking to him and he asked me to come in there and listen to a conversation or something.

D. Ok. And so you had access to his cell?

K. Yes.

D. And did you know what he wanted you in his cell for?

K. Ah, no, he just said that he was being wrongly accused of something and he did not want to let the story out, but he needed a witness, somebody to hear his co-defendant.

D. Ok. Did you ever meet his co-defendant?

K. No, I didn't.

D. Do you recall his name? Would you know his name if you heard it?

K. Yes.

D. Do you know the name?

K. Um, I am saying Adams, uh, …

D. Does Adam Blackford sound right ?

K. Adam Blackford, yeah.

D. Ok. All right, did he say he wanted you to come in there and listen to what …a conversation between he and Adam Blackford?

K. Yes.

D. Ok. And did you do that?

K. Yes, I did.

D. Was this in the morning, afternoon, or what?

K. It was a break time. They have different break times than we did. I believe it was in the afternoon. Could possibly be in the morning, I am not sure.

D. So where was Adam Blackford when this conversation took place?

K. He was out on the break yard.

D. Ok, now how did he and Issac Marta have a conversation?

K. The windows were pointing right outside the break yard in his room. There were holes in the window where everybody was passing cigarettes and stuff like that through them. Right through that window right there.

4

D. Ok, were the holes…was the window glass, or something else?

K. I am pretty sure it was hard plastic.

D. Ok.  And had these holes been cut in there or how had the holes…?

K. They probably had been heated up with something.

D. So maybe cigarettes?

K. Yeah.

D. So you are saying you couldn't smoke in the jail?

K. You were not supposed to but, …

D. Ok.

K. (laughs)

D. All right.  So what was the conversation you heard?

K. Uh..on this day he had called me to the room . I guess it was because I wasn't from around there. He knew I didn't have no part of the case or nothing like that. And (unintel.) he just wanted me to hear a conversation.  I guess, yeah. So I went into the room and they were outside in the ball field and he banged on the window and Blackford came over to the window and he said, "what's going on?" and then Issac was telling him "hey, I want to know why you are doing this stuff, you know, what's going on here"?   Blackford told him "hey, you know, it's like this, I get a good deal if you fall with me."  And he goes " I don't understand ."  Well, I guess they had been out drinking the night before and this is how he (unintelligible) I went to rob this guy and things went bad and things like that here and there and (unintelligible)  I had been at that spot. The Prosecuting Attorney had told him, you know, that he would get a good deal if he took Issac with him.

D. Ok. Now, did you understand if Issac was there when the murder happened, or was he not there?

K. He was not there.

D. Was not there.  How do you know he was not there?

K. Blackford said he wasn't there.  Blackford said he went home and then went afterward.

D. Ok.  So Blackford said unmistakably that Issac was not there?

K. And Issac said why are you bringing me down like that and he goes I have to because  will get a better deal with the Prosecutor.  And he said "I wasn't there"…this is Issac saying he wasn't there, and Blackford said I know you wasn't there, but I have to bring you down.

D. Did he name that Prosecutor?

5

K. Rhoades.

D. Rhoades?

K. Yeah.

D. Do you know what the deal was?

K. I didn't know what the deal was. He was supposed to get a lesser charge of not murder..ah, something accidental, I have no idea.

D. Ok. So after you had talked with Rhoades, you say you were shipped out of there pretty quick?

K. Yeah.

D. How did you leave? Did somebody from here go down there and get you?

K. No, Colorado Transportation. They got a fleet that comes and picks up inmates and they told me somebody had made a special transport to pick me up. I didn't get back to Idaho until almost 2 ½ weeks later.

D. Oh really?

K. Yeah. I was on transport all over the...

D. So they said there was a special deal to come get you?

K. Yeah. They just got me out of the county jail and took me on transport all over the state. I came to Idaho 3 times and they didn't drop me off yet.

D. So did they say why, or how, or who contacted them?

K. No, they didn't. It just never occurred to me. I thought my time was up and they were coming to get me.

D. How many times did you hear this conversation? More than once?

K. I heard it several times...about 3 or 4 times. I am going to say about 4 times I heard this conversation. Every time... I hate to say Issac, you know, he was always whining to him, I mean, hey why are you doing this to me, hey you know, trying to plea, you shouldn't be doing it. Every time Blackford said you know, I have to. Well, it is part of the deal that I make, and also every time these guys came out to break he would always pull me over saying 'come listen to this,' you know, trying to get something more and every time I just heard ' I got to do this'.

D. All right, did you have any reason to believe or disbelieve Issac?

K. No. I didn't.

D. So did you believe him?

K. After he told me that family and all that and they were just out partying together and when he went home, you know and get in bed with his wife and he did not have no part of that and it was no big deal for me because I know I was

6

going to come back to Idaho anyway.  You know.  But I believe that he didn't have no part of it .

D.  Uh-huh.  Do you have any doubts that Blackford did it?

K.  No, no.  He said straight up hey things were going bad and one thing went to…he was trying to rob the dude.  I heard he had a lot of money, or whatever.  Blackford tried to rob him and things were going bad and he ended up where he ended up.

D.  Did he say how he killed him?

K.  No.

D.  Did he say what he used to kill him?

K.  No.  I didn't …nothing like that.

D.  Did he ever mention any of the items that he may have taken from him?

K.  He said he led the cops out there where all the stuff was.  I don't know  where it was, some creek or something like that, I'm not too familiar with that.  Issac said 'well, I didn't have no part of that' and Blackford said ' I know you didn't but I (unintelligible)  anyway.

D.  Okay.

K.  Marta was letting him use him as a scapegoat that he was with this guy the night before and he was trying to get out of being pin pointed for the main guy that did it.

D.  So let's go back to Bruce Rhoades a minute.

K.  OK.

D.  You are certain that Bruce Rhoades knew of this conversation between Adam Blackford and Issac Marta?

K.  Yes.

D.  And you told essentially what you have told me.

K.  Yes, I did.  He has it recorded somehow.

D.  Oh, he recorded it?

K.  Yeah, he recorded it.

D.  Did you ever talk to any other official in the Washington County jail about this same situation?

K.  Um, I believe there was another one there but I am not to sure what his name was .  They took me upstairs and I ..right before court and I had to sign extradition papers…(unintelligible)

D.  Was this person…would he have been named Rexford?

K.  Rexford?

7

D. Chuck Rexford?

K. I am not too sure.

D. Okay. But it was someone from the jail?

K. Yeah.

D. Not the Prosecutor's office?

K. No sir.

D. All right. Kevin I don't have anything else to ask you. Is there anything you would like to add to this?

K. I am doing this on my own free will. I ain't trying to take nobody's side or nothing'.

D. We haven't paid you anything or promised you anything?

K. No.

D. If Issac were to get a new trial and you had the opportunity to come back and testify in his behalf, would you be willing to do that?

K. Yes, it depends on the State of Idaho and whatever they got to say, but I believe, you know, giving back what is right. That's what I heard and that's my testimony.

D. Ok. Well, Kevin, I appreciate the help on this and hopefully you might be able to get a man freed for something he did not do. And I am going to terminate the recording. It is now I:7 P.M. Thank you.


*Marker #168 on tape.


Don H. Dunn (Ret.)
Dunn's Investigations
212 Valley View Church. Rd
Harrison Arkansas 72601

# 870 -391 - 8696

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

YITZHAK ABBA MARTA                                                PETITIONER

       VS.                    *CV-2005- 380-5*
                     No. eR-16-1739

LARRY NORRIS, DIRECTOR                                            RESPONDENT
ARKANSAS DEPARTMENT OF CORRECTION

## HABEAS CORPUS PETITION

### {ACA 16-112-101-123

Comes now the Petitioner, Yitzhak Abba Marta, (Issac), ADC# 102554, and for

his pro se Habeas Corpus Petition for absolute dismissal of the criminal conviction

against him, alleges and states:

    1.    That Petitioner, an indigent, is a prisoner in custody of the Arkansas

Department of Correction, Tucker Maximum security Unit; under sentence of the Circuit

Court of Washington County, Arkansas, having been sentenced on July 11, 1997, for

conviction of a felony.

    2.    That said conviction was based on information or warrant filed against

Defendant/Petitioner on or about November 13, 1996, accusing the Defendant/Petitioner

of the offense of Count One-Capital Murder in violation of Ark. Code Ann. 5-10-101

(a)(2), a class Y felony.

    3.    That Petitioner is being held unlawfully and this Court has jurisdiction

pursuant to the Arkansas Constitution and Arkansas Code Annotated 16-12-101 ET seq.

    4.    That the Trial Court lacked jurisdiction and the Petitioner is held pursuant

to an invalid conviction. Petitioner bases this allegation upon the following facts:

1

FILED IN MY OFFICE AND SUMMONS
ISSUED AT _1: 02_ O'CLOCK _P_M
_____ 5-23-05 _____ DATE.
FLORA C. COOK, CLERK
_Brenda Hardin_
C/C _Amk To Plnintf_

34544

## GROUND ONE

The Trial Court lost jurisdiction over the above styled criminal case when it allowed for United States and Arkansas Constitutional and Statutory violations to occur at trial.

United States Constitutional acts 3.2(d): *"The trial of all crimes, except in cases of impeachment, shall be by jury;" United States Constitutional Amendment 6 states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district where in the crime shall have been committed,"* these being made applicable to me by United States Constitutional Act 6, -2: *"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."*

And, United States Constitutional Amendment 14, -1: *"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or amenities of the citizens of the United States; nor shall any state deprive any person of the life, liberty, or property, without due process of the law; nor deny to any person within its jurisdiction the equal protection of the law."*

2

Also, Arkansas Constitutional Act 2, -10: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by impartial jury of the County in *which the crime shall have been committed.*" This right to a trial by an impartial jury was violated. To wit: In the 'Supplement Abstract for the Appellant,' page 20 notes that the Defense filed a 'Motion for Yitzhak Abba Marta to Appear at all Court Appearances in Civilian Clothing and Without Restraint.' This motion was not responded to by the prosecution, and as all other motions were, until the Omnibus Hearing.   In the motion Defense Counsel, Denny Hyslip, wrongly cited the A.R.Cr.P. on this matter as rule 33.1, which was changed approximately a year before this case.  The State of Arkansas adopted a new Rule, 33.1 and numbered it as 33.4, which states:  Custody and Restraint of Defendants and Witnesses:  "Defendants and Witnesses SHALL NOT be subjected to physical restraint while in Court unless the Trial Judge has found such restraint reasonably necessary to maintain order.  If the Trial Judge orders such restraint, he SHALL enter into the record of the case the reasons therefor.  Whenever physical restraint of a Defendant or a Witness occurs in the presence of the jurors trying the case, the Judge shall upon request of the Defendant or his Attorney instruct the jury the such restraint is not to be considered in assessing the proof and determining guilt."

This was addressed on pages of 92-97 of the Supplement Abstract for Appellant. Defendant was on trial for 3 days and completely shackled, i.e. handcuffed to a belly chain and in leg irons during the entire trial, including voire dire, except for the time allowed for Defendant to take the stand, at which time the belly chain swung from the waist of Defendant.  The leg irons were left on at all times and Defendant had to hobble by the jury.

3

Docket Sheet record indicating the Defense's Motion for Defendant to appear in Court without restraints, Bruce Rhoades objected to the Defense Motion, which is found on page 94 of the trial record. Mr. Rhoades suggested the leg shackles could be taken off prior to the jury entering into the jury box if the Defendant was going to testify, but asked that the leg shackles be left on otherwise. Mr. Rhoades gave no reason for wanting to keep Defendant in handcuffs and leg irons while in front of the jurors. The trial record quotes Mr. Rhoades: "And I would ask that the shackles be left on, the leg shackles..."

First, the State concedes that, with respect to trial, shackling Defendant in front of the jury would be a problem. Mr. Rhoades started to contend Defendant's appearance in court in street clothes, but that was not, as the Court noted, any real concern of the State. As to the restraints, as A.R Cr.P rule 33.4 notes, the Judge must *order this and detail his reasoning for the record in court.* From the record (pg.93) the Court responded to defense attorney, Mr. McLemore's request that the Court order the jail to make sure the Defendant is in "street clothes and not shackled or cuffed for all future court appearances." The court responded, "Well, I'm not going to issue an order, but if you have a problem with it, you let me know and I'll address it." Clearly, the Court sided with the Prosecution. Then, after the above request by Mr. Rhoades, the Court says, "Well, I've already denied their motion." Mr. Rhoades continues his argument and the Judge states: "Here's what I'm going to do. I'm going to address the issue with the Sheriff and if it's a problem, we'll proceed accordingly. I think traditionally in these cases people who are in custody and brought up here for these hearings and other hearings in jail clothing and restrained appropriately. I see no real reason to do it here, but I dressed in, for lack of a better description, civilian clothes. Today, apparently there was

4

not. I don't know what happened in terms of what took place with the Sheriff's department on this issue, but I'll look into it. I'll address it. Plaintiff contends that this unconstitutional tradition and the Courts ignoring A.R.Cr.P Rule 33.4 even after the Defense brought it to his attention, seems from the record, to be systematic. After defense attorney Mclemore tried again he leaves his motion by stating, "It worked informally properly here and I'm going to ask that we be permitted in your eyes to do it again." The Court responded, "Well, I'm not going to permit anybody to do anything until I have an opportunity to discuss the issue with the Sheriff. He operates the jail...and if it can be done without an undue burden to the Sheriff and his staff, well, then, we'll probably do it. But, if it causes problems, we may not do it. But I will, at the conclusion of this hearing or certainly within the next day or so, address this issue and try to resolve it."

The Court's own words have no reflection or concern for the security risk pertaining to Defendant, but an *"undue burden to the Sheriff and his staff."* No concern regarding Defendant's rights under the law was manifested, but simply a concern for what the Sheriff wanted and what the prosecution wanted.

Defendant had not given the jailers any problems whatsoever, was never a security risk at any time, and was under a two hundred and fifty thousand dollars bail. There was no issue of escape attempts, or other conduct charges before the trial. Defendant had always maintained his innocence and was confident that the trial would prove his innocence, therefore, was doing nothing that would jeopardize his exoneration.

Rule 33.4 states: *"Defendant...shall not be subjected to physical restraint while in court (not just at trial) unless the trial judge has found such restraints reasonably*

5

*necessary to maintain order."* Defendant was clearly no security risk at any time during incarceration prior, or during the trial.

Given these facts and circumstances, Defendant asserts the trial judge was clearly in error in ignoring Rule 33.4 for no other obvious reason than to satisfy the Prosecutor under the guise of having concerns for possibly what the Sheriff might wish. Defendant contends that the sole decision rests with the Court, not the Sheriff or the Prosecution. It is apparent that clothing which Defendant wore was the only concern with the Court, not handcuffs and shackles. The appearance of Defendant before the jury was not a concern of the Court because at no time did the Court enter into the record an order, or his reasons for Defendant being completely restrained. The Court did not instruct the jury *that such restraint is not to be considered in assessing proof or determining guilt.* The Court stated that he would address the issue, but never did. The shackles and restraints were clearly visible for the jury irrespective of Rule 33.4.

The Arkansas Supreme Court in Baker v. State, 308 Ark. 266 decided a similar case to this case of Defendant-Petitioner, but of less magnitude, but to the extent of prejudice resulting from the Defendant appearing in restraints. In that case the Court said, "Here we can safely assume that Townsends comings and goings in leg irons through the front door of the courtroom and in full presence of the jury, did not go unnoticed..."

"Although there is sufficient circumstantial evidence to convict both Townsend and Baker, we should view the effect, if any, that the placing of Townsend in leg assessment of punishment for the two parties..." " Similarly, the resulting prejudice, here, warrants a new trial for both appellants."

The disregard for the Arkansas Rule of Criminal Procedure 33.4, in pursuance of

6

the Federal and State Constitutions denied Petitioner the right to a fair trial by an impartial jury. In Hallbrook v. Flynn, 475 U.S.560, the U.S. Supreme court said, "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that *"one accused of a crime is entitled to have his guilt or innocence determined sole on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, or continued custody, or other circumstances not addressed as proof at trial."*

Citing Taylor v. Kentucky, 436 U.S. 478, the degree of prejudice Petitioner received during three days of exposure to the jury while hobbling by them in shackles is immeasurable, but must be conceded in light of other rulings based upon the law pertaining thereto. This is reflected in the case of Kennedy v. Cardwell, 487 F.2d 101 (6th Circuit 1973)

Petitioner asserts that the Trial Court lost jurisdiction by Trial Court's ignoring the law governing shackles and other restraints before a jury. In Ellege v. Dugger, 823 F.2d 1439 (11th Cir. 1987) the Court said, "Initially, the prejudice perceived when a defendant is seen in shackles by the time the jury involves the presumption of innocence, there could be no impartial jury or presumption of innocence, if I was already shackled down like a guilty criminal, a crazed uncontrollable psychopathic killer."

Arkansas Rule 33.4 specifies that not even witnesses can be subject to restraint without an order on record and the reasoning for such order. Petitioner's five witness from the jail were restrained, thereby subjecting the jury as the credibility of their testimony. The record reflects these witnesses by name: Mark Killion, Guillermo Roca, Johnny Marney, Billy Roe, and Philip Guartney. Petitioner asserts that 75 A.L.R/ 4th

7

1356 prohibits witnesses from being in restraints while before a jury.

U.S. Constitutional trial law, as well as Arkansas Trial law support the assertion of Petitioner that the Trial Court lacked the jurisdiction to enforce judgment and commitment. (See: California v. Minor,42 Cal 165 1871; Hall v. Indiana, 199 Ind. 592 (1928); Blaine v. U.S. App. D.C. 64(1943); Smith v. State, 247 Ala.354(1946); Eaddy v. The People, 115 Colo. 488 (1946) New York v. Mendola, 2 N.Y. 2d 270 (1957); Illinois v. Boose, 66 Ill.2d 261 (1977); Washing v. Hartzog, 96 WA 2d 383 (1981); New York v. Vigliotti, 203 A.D. 2d 898 (1944); Washington v. Finch, 137 Wa 2d 799 (1999);

Regarding the rules of law regarding this case, Petitioner prays the Court reverse and remand for a new trial.

Respectfully Submitted,

Signature

Yitzhak Marta

M.S.U # 102554

2501 State Farm Rd.

Tucker, AR 72618

On the 19th day of April 2,005

Notary

9-30-2,007
Commission Expire

8

```
CMSOFM10                      WASHINGTON CO - CRIMINAL CASES  Today's Date 09/01/04
  PARTY DOCKET                       DISPLAY CASE
Case         96-CR -001739   Case Party 0002                    Roll      Fr
Type/Desc  CAPITAL MURDER              Arrest Tracking 400393
Filing      12/16/96       Arrest                             · Warrants   0
CASE TYPE      MR            Offense 11/08/96                     Inactive  0
Show Cause?                     Trial        TIME   :    M        ACT 346   0
Court #                      Last Trans 02/04/99 Reop          Hot Checks  0
Last Status    CLJC.............on 07/11/97              Fine $        .00
------------------------------------------------------------------------------
Actions  02/11/97 --M HUDSON
                  BRIEF IN SUPPORT OF INDIVIDUAL
                  --SEQUESTERED VOIR DOIRE  D HYSLIP
                  --K MCLEMORE  M HUDSON
                  MOTION REQUESTING INFORMATION
                  --CONCERNING THE CHARACTER OF THE
                  --VICTIM  D HYSLIP K MCLEMORE  M HUDSON
                  MOTION FOR YITZHAK ABBA MARTIN TO APPEAR
                  ---AT ALL COURT APPEARANCE IN CIVILIAN
                  --CLOTHING AND WITHOUT RESTRAINT
                  --D HYSLIP   K MCLEMORE  M HUDSON
                  MOTION TO COMPEL STATE TO CONDUCT TRIAL
```

# DUNN'S INVESTIGATIONS, INC.

212 Valley View Church Rd
Harrison, Arkansas 72601
870-391-3696

January 25, 2005

The Honorable Justices ▓▓▓ *of Jefferson County*

▓▓▓▓▓▓▓▓▓▓▓

Re: Yitzhak Marta #102554

▓▓▓▓▓

     Mr. Marta has asked me to submit a letter to you in his behalf. I have typed the Petition for him and made some corrections by omitting some things that appeared to be not on point.

     First, let me say that I did not know Mr. Marta prior to his incarceration in the Washington County jail at Fayetteville. His father, the late Frank Marta, had me investigate the circumstances surrounding the arrest. I went to the jail with an attorney friend of mine and took a recorded statement. Mr. Marta mistakenly thought that if one is innocent it would result in his being freed and would not put his family to the expense of hiring an attorney. As a result, he relied on the public defender.

     The Deputy Prosecutor was Mr. Bruce Rhoades and I must say, the most unscrupulous and unethical individual I have met in my 38 years of professional investigation. He intimidated Mr. Marta's wife, who was extremely ignorant of the law, and threatened her with charging her as an accomplice to murder. Nothing could have been further from the truth. He told her that if she did not "cooperate" with her and say what her wanted her to say, she would be charged.

     Another man, a druggie and drifter from California, is the person who robbed and killed the victim. There was no proof that Mr. Marta was present when the murder occurred. Mr. Rhoades knew that and made a deal with the real killer, Adam Blackford, to implicate Mr. Marta solely for the pleasure of getting two convictions.

     Mr. Marta was at home in bed with his wife and had been drinking heavily and was sound

Mr. Marta was at home in bed with his wife and had been drinking heavily and was sound asleep when Adam Blackford left the premises of Mr. Marta's home. As it turned out, he went back to murder and rob the victim. He subsequently took deputies to the place he had disposed of the stolen items.

Blackford also had blood on one of his boots that matched the victim's blood. However, there was not one iota of forensic evidence that connected Mr. Marta to the scene. Other prisoners were interrogated by me and they related that they heard Blackford tell Mr. Marta that he (Blackford) knew that Marta did not do it, but he had a "deal with the Prosecutor." When Rhoades learned that I had attempted to get Blackford to talk to me, he wrote a letter to the Sheriff asking that I be banned from the jail. He subsequently issued a subpoena for me and attempted to force me to disclose my investigation. He even threatened me with bodily harm if I did not cooperate. I had to get an attorney to get it squelched.

Mr. Marta's wife told me that Mr. Marta was home in the bed on the morning of the murder. She also told her sister, but on the date of trial neither of us were called to impeach her testimony. Prior to that all the statements I took were turned over to Mr. Rhoades by the Public Defender without my knowledge or consent. That is when Mr. Rhoades turned up his harassment toward me.

In summation, Adam Blackford was sentenced to 30 years with 15 years suspended and imprisoned in California where there was a warrant for him on an unrelated charge. Mr. Marta, on the other hand, was sentenced to life without parole for a murder he did not commit. He mistakenly thought that the innocent is always exonerated. Ignorance of the value of good representation is his only crime and for that he is punished for life without parole.

I know as much as anyone can, that Yitzhak Marta is not guilty of that which he is accused. I hope you will consider his Petition for a Trial de Novo and correct a horrible injustice.

Respectfully yours,

Don H. Dunn

05/26/2005  23:43  0979376755-HLJ      Document 905-2  Filed 07/25/2008  Page 12 of 12   14
Case 5:08-cv-00171-JMM-HLJ      COMPLIANCE PAGE 14                                          332330

ARKANSAS DEPARTMENT OF CORRECTION - TRUSTFUND CENTRALIZED BANKING - PINE BLUFF

Task No: 1540018
Task Date: May  3 2005  2:00PM
Task Type: Resident Withdrawal
Bank Acct: Trust
Check No: 32998
Pay To: Jefferson County Circuit Clerk
Amount: 100.00
Memo: Y Marta 102554/File fee/Corpus Petition
Comment: Jefferson Co. Circuit Clerk/Filing fee
Resident Id: 102554
Personal Id: 102554
Full Name: Marta, Yitzhak
SSN:
Date of Birth: Aug 13 1975 12:00AM

ORIGINAL CHECK HAS AN ARTIFICIAL WATERMARK ON REVERSE SIDE - HOLD AT AN ANGLE TO VIEW

**ARKANSAS DEPARTMENT OF CORRECTION**
TrustFund Centralized Banking
P.O. Box 8908
Pine Bluff, AR  71611-8908

Bank of America    81-7/820    **032998**

5/3/2005          $100.00
DATE             AMOUNT

One Hundred and 00/100 Dollars

PAY TO THE ORDER OF    Jefferson County Circuit Clerk
Jefferson County Circuit Clerk
P. O. Box 7433
Pine Bluff, AR 71611

01 05-300=5

Y Marta 102554/File fee/Corpus Petition

⑆032998⑆ ⑉082000073⑉ 004163432207⑆

ARKANSAS DEPARTMENT OF CORRECTION · TRUSTFUND CENTRALIZED BANKING · PINE BLUFF